You may be seated. Good morning, Council. Our next case for today is case number 4 16 0 1 7 2 N. Ray M.G. And for the talent, we have Mr Reardon and for the athlete, Miss Brooks. Is that correct? You may proceed, Council. I'll try to be distinct and brief as possible. We're seeking four avenues of relief. We believe that the evidence showed that Mr G, albeit in his daughter's life, he was doing the visitation that he was allowed. He was trying to keep up on her progress through DCFS visit coordinators. I admit denied that he probably wasn't the most active father, but we've got to look at where he was in life. He was a fine bar in doing what he could. Uh, it's clear from the trial record that had he called, the foster parent would not have accepted his calls. Uh, so the only time he could make reasonable attempts and reasonable efforts to maintain the contact with his daughter was through his visits that were coordinated through the Department of Children and Family Services. The next issue is, I believe, set forth is the depravity that the court found him depraved. Now, I admit, I have never disputed that he had more than three convictions. I think he's met the requisite amount of convictions, but I don't think that is the only nexus. Then they have to check it. What is he doing to better himself to make sure that he robust that presumption? I think the record is clear throughout it. Since his last incarceration, he obtained substance abuse counseling, parenting classes, anger management, was doing things that he'd never done before despite previous incarcerations. And so I believe he had rebutted that presumption. How much M. G. Is going to be five in November? How much of those five years has he been in prison? Or maybe I should ask it this way. How long has he been out while she was born? I believe she was taking away into foster care from the biological parents. I believe it about 18 months thereabouts. Was he in prison during those first 18 months? No, he was out during those portions. And then the for domestic is what incarcerated him to which he was incarcerated until recently. But the first 18 months, it appears that he was an active participant in the daughter's life. And I think there was some evidence they lived together, or at least he lived next door. And whose version of events believe the next issue. I understand the Supreme Court is against me in this, but would ask the court certify that issue that the plain language of the statute requires heated incarcerations, which means more than one. And it has to require you to not be able to discharge your parental responsibilities. Mr. Garza had no parental responsibilities before this child was born. You can't be a parent when you're not a parent. You can't be held to a standard of parental responsibilities when you're not a parent. And this child, this is the only time of incarceration after this child's birth. And I know the case laws against me and Gwen, and I understand the case law. So I'm not sure what you expect of us given our obligations. I understand we're all bound by stare decisis, Judge. I just had to raise the issue that I seen presented, that this was not repeated incarceration. I believe the statute speaks for itself. The last issue, and I believe perhaps the the next issue is I don't believe the state proved by reponse of the evidence that terminating his parental rights was in the child's best interest. I understand the state seeks stability, but the evidence produces that Mia Gee's aunt was a visitor, a regular visitor, and that this father was active in her life for the 18 months and had regular visits. So making this person persona non grata, I don't think there's any evidence to suggest that this somehow benefited the minor child. Lastly, and I think our most critical issue that I think raises the most flags is parent. Parenting is an inherent liberty. It is founded in our Constitution. If we're gonna take that away, I think we ought to do so, not lightly, which I'm not suggesting the court did, but we also have to get the due process right as the one. And it's clear from the record in the very beginning. Mr Garza was pro se, if you will, in his first court appearance. And and the transcript is clear. What was advised and and the what I call the other parents. These were a family, if you will, a split family. We had the respondent mother, who was the mother of 16, 17 and 18 cases. Mr Ramsey, who was the father of 16 and 17. The court on record at this point, Mrs Plummer, Mr Ramsey and at this point, Mr G, if you are not in custody to cooperate fully with DCFS home and background investigations, including signing releases as they request. And that went on for a period of months, changing of counsel. Well, counsel, let me stop you there. You're referring to the May 2013 shelter care hearing, right? That's the admonishment you just referred to. Yes. Didn't the court also specifically tell your client that he was also required to cooperate with DCFS to correct the conditions which require the child to be in care or you will risk termination of your parental rights? Didn't the court also say that at that same hearing? Yes, but with that caveat, I think in front of it. So, Mr G, at this point, I interpreted if you're not in custody. Well, let's let's look at the quote entirely. The court said you are required, respondent mother, and then some in between that. And then at this point and respondent father, if you are not in custody to cooperate fully with DCFS home and background investigations, including signing any release they request, period. Then you are also required. So didn't the court really delineate the different responsibilities between the respondent who was in custody and the one who was not with respect to the background and home investigation? I mean, is that a fair interpretation of what the court said? I could say it would be interpreted that way. But let's assume that it's not. In October of 2013, when your client admitted the allegations, the court again admonished the parties that if you fail to correct the conditions which require the child to be in care by completing the service plan and cooperating with aftercare plans, that you would risk losing your parental rights. And then in February of 2014, at a permanency hearing, the court gave the same admonishment. So if we assume that you're right about the shelter care, which I think is a weak argument, was it cured by those additional admonishments on those following dates? It depends on his understanding of the initial. I don't, as I say here today, I can't tell you what I understood on the first one. Well, maybe my question is a poor one. Did the court sufficiently cure any lacking admonishment by those subsequent admonishments? That would be for this court's determination. Thank you. Thank you, counsel. You'll have time on rebuttal. Counsel? Good morning, Your Honors. I'm Allison Paige Brooks appearing on behalf of the people. May I please the court? Counsel? First of all, with unfitness, the state does take the position that the DD opinion is controlling because of the interpretation of repeated convictions, repeated incarceration subsection S. Because the defendant, or the respondent father's interpretation should be rejected on that ground, and there's only one prong of unfitness that needs to be met in order to be not against the manifest way of the evidence, this court could affirm the unfitness finding on the basis of that ground alone. But in addition, there were two other grounds, the interest, maintaining a reasonable degree of interest, concern, and responsibility. The respondent's father's position is that because he was allowed visits in prison, he was, quote, doing what he could. However, the trial court referred to the lack of the stacks of letters over the years that, this many months that respondent father was in prison, and there was very limited attempts. And the testimony was pretty detailed on the point, and eventually he came to the position that he didn't have an interest despite having pens and paper in prison. However, he also was admitted that he knew that he had the address for his sister, and that his sister had contact and was able to have contact with the minor, and as well as he knew the address and was in some contact with his caseworker, and he could have asked the caseworker about how the minor was doing. But there was, again, very little contact in the way of maintaining a reasonable degree. And so the trial court's ruling on that was not against the manifest way of the evidence, and that one is very clear. With respect to the depravity, again, like the DD's situation with Subsection S, under Subsection I, depravity, the respondent's position is contrary to law. The Shanna W. case shows that rehabilitative efforts have to take place outside prison. So engaging in prison programming, which is he rebutted the presumption of depravity through rehabilitation, is not possible to do that inside prison. So he has to show that he has rehabilitated himself by living successfully outside prison. That's not something he's been able to do at the time of the termination hearing because he's only been paroled recently. So with those respects, unfitness findings should be affirmed. With respect to best interests, there are several factors here that show that although there is some point to what Respondent Fodder mentions, the benefit to continuing visitation, however, the trial court has to engage in a balancing of factors. And that's why the best interest factors don't one thing like the benefit of visitation does not control over the many strong factors that the trial court relied on, particularly stability and permanency that the minor deserves. The fact that foster parent has two the evidence and also they all came to the household in May 2013. There's been very limited contact with Respondent Fodder and they're saying he had more contact before he got sent to prison in 2013. But this is a young child and that is very limited contact in that time since May 2013. Physical safety is an important thing the trial court relied on. This was a domestic violence situation beforehand. The minor is safe in the foster parent's home and the attachment now, more recent attachment to the caregivers. And so because of the good care in the foster home, it's overwhelming on best interests, not against the manifest of weight of the evidence. With respect to due process, the issue is forfeited because it was not raised below. That's the MW case. Section 1-5 subsection 3 in which the Respondent relies refers to the, it refers to if the child is abused, neglected or dependent, the court shall admonish the parents that if the court declares the child to be awarded to the court. So this is if the child is alleged, they have to be, they have to have this admonition. However, there was many times the record where he received appropriate admonitions and the Respondent's the caveat, if he was not in custody, he was strained. And it should have been obvious that because he wasn't in custody, he couldn't cooperate with the home investigation. So therefore he was accepted from that particular requirement. So there is no due process violation and there were adequate warnings in the context of neglect, adjudication and disposition. For those reasons, the state requests this court to affirm on entertaining the questioning. I don't see any questions. Thank you, counsel. Any rebuttal counsel? This would be to the best interest of the child. The child court found on the record that the Respondent father had been making efforts to improve his life and was correct in the conditions that caused me to be in the foster care. And there was further circumstantial evidence. I think it's crucial here that this child knew that person as their father because the I actually know referred to the bus parents. Grandpa. That's what the record shows. So if we have a grandpa, we know something else is our father. And I think that's a bond that we can't take lightly to shred. Thank you. Thank you, counsel. This matter will be taken under advisement.